**Willie B. BROOKS, Appellant,**

v.

**Dr. George J. BETO, Director, Texas Department of Corrections, Appellee.**

**No. 22809.**

United States Court of Appeals
Fifth Circuit.
July 29, 1966.

William VanDercreek, Dallas, Tex. (court-appointed), for appellant.

Charles B. Swanner, Asst. Atty. Gen., Waggoner Carr, Atty. Gen. of Texas, Hawthorne Phillips, First Asst. Atty. Gen., T. B. Wright, Executive Asst. Atty. Gen., Howard M. Fender, Asst. Atty. Gen., Austin, Tex., for appellee.

John Doar, Asst. Atty. Gen., David L. Norman, Albert S. Pergam, Charles R. Nesson, Attys., Dept. of Justice, Washington, D. C., for the United States as amicus curiae.

Before TUTTLE, Chief Judge, and BROWN, WISDOM, GEWIN, BELL, THORNBERRY and COLEMAN, Circuit Judges.

**4**

JOHN R. BROWN, Circuit Judge:

Unlike the other cases [1] heard en banc, this one does not challenge the *exclusion* of Negroes from grand or trial juries. Rather, this case seeking habeas from a Texas conviction for rape complains of purposeful *inclusion* of Negroes in the grand jury returning the indictment.

Following the exhaustion of state remedies and rejection of this challenge by the Court of Criminal Appeals of Texas, Brooks v. State of Texas, Tex.Cr.App., 1960, 342 S.W.2d 439, on rehearing, 1961, 342 S.W.2d 442, the Federal District Court after a full evidentiary hearing denied habeas by Memorandum Opinion.[2] The case is a tribute to the Bar, for beginning with the initial trial in the State Court through the habeas in the Federal District Court and the appeal before us, the accused has been represented by court-appointed counsel who have sharply defined the issues and presented them with zeal.[3]

At the heart of the matter, the question facing us is whether we should adhere to Collins v. Walker, 5 Cir., 1964, 329 F.2d 100, on rehearing, 1964, 335 F.2d 417, cert. denied, 379 U.S. 901, 85 S.Ct.

189, 13 L.Ed.2d 175. For while the District Judge, conscious of *Collins* and his obligation to follow it, undertook to distinguish it, we do not think this may fairly be done as to its broad holding and rationale. On re-examination of the problem, we disapprove *Collins*, conclude that there has been no denial of equal protection or due process, and affirm the Federal District Court.

I.

The Texas system—passing muster on three occasions [4]—for constituting the grand jury is highly selective, and relying at no stage on random choice or the laws of chance, it commits much to the Jury Commissioners. Under Texas law [5] the District Judge, usually prior to the opening of the term of court, selects not less than three nor more than five qualified persons from different portions of the county as Jury Commissioners, Art. 333. The judge instructs them on their duties, Art. 336, and administers a comprehensive oath, a significant portion of which is the obligation not to "knowingly elect any man as juryman whom you believe to be unfit and not qualified," Art. 335. This means, of course, that only those having the qualifications prescribed

---

1. Scott v. Walker, 5 Cir., 1966, 358 F.2d 561 [No. 20814]; Billingsley v. Clayton, 5 Cir., 1966, 359 F.2d 13 [No. 22304]; Davis v. Davis, 5 Cir., 1966, 361 F.2d 770 [No. 21976]; Rabinowitz v. United States (Jackson v. United States), 5 Cir., 1966, 366 F.2d 34 [Nos. 21258 and 21345]; Labat v. Bennett, 5 Cir., 1966, 365 F.2d 698 [No. 22218].

2. Brooks v. Beto, S.D.Tex., 1965, 241 F. Supp. 743.

3. Counsel for petitioner are:
 In the State Court Proceedings:
 Gordon R. Wynne of Wills Point, Texas
 In the Federal District Court Habeas:
 William C. Bullard and
 William Chanslor of Houston, Texas
 In this Court:
 William VanDercreek of Dallas, Texas,
 Professor of Law
 Southern Methodist University
 School of Law

4. In Smith v. State of Texas, 1940, 311 U.S. 128, 130–131, 61 S.Ct. 164, 165, 85 L.Ed. 84, 86–87, Mr. Justice Black stated: "* * * [T]he Texas statutory scheme is not in itself unfair; it is capable of being carried out with no racial discrimination whatsoever. But by reason of the wide discretion permissible in the various steps of the plan, it is equally capable of being applied in such a manner as practically to proscribe any group thought by the law's administrators to be undesirable." Subsequently in Akins v. State of Texas, 1945, 325 U.S. 398, 403, 65 S.Ct. 1276, 1279, 89 L.Ed. 1692, 1696; Cassell v. State of Texas, 1950, 339 U.S. 282, 284, 70 S.Ct. 629, 630, 94 L.Ed. 839, 846; and Hernandez v. State of Texas, 1954, 347 U.S. 475, 478–479, 74 S.Ct. 667, 670, 98 L.Ed. 866, 870, the Supreme Court noted that the Texas system had been approved.

5. Vernon's Ann.Tex.Code Crim.P.Ann. arts. 333–366.

in Art. 339 may be chosen for the list [6] of 16. Besides the traditional ones on residence, a limited voter qualification, absence of a criminal record, the most notable are the requirements that the grand juror "4. * * * must be able to read and write" and "3. * * * must be of sound mind and good moral character."

The Jury Commissioners thereupon select 16 qualified persons "from the citizens of different portions of the county," Art. 338. The 16 selected are put on the list which is sealed and filed, Art. 340. When, in due course, the list is opened, the 16 persons on the list are summoned and inquiry is held as to their qualifications, and when the 12 are found qualified, the District Court impanels them as a grand jury. Arts. 344–345, 352–355, 357.

## II.

Before examining the details as to why or how it came about, it sharpens the focus to state broadly that in the operation of the grand jury selection machinery in this case, two members of the list (who subsequently became two members of the panel) were selected because, among other reasons, they were Negroes.

The Petitioner, Brooks, a Negro, was convicted in 1960 after a jury trial before Judge A. A. Dawson, 86th Judicial District, Van Zandt County, Texas, for raping a white woman. Petitioner was originally indicted in August 1959 by an all white grand jury impaneled under a system that concededly excluded Negroes for racial reasons. Van Zandt County, located in the eastern part of Texas, had a population of about 25,000 of which approximately 10% were Negroes. Although the state trial Judge, in giving the statutorily required instructions to the Grand Jury Commissioners, had apparently instructed them from term-to-term that they were not to exclude jurors because of race, historically Van Zandt County had never had a Negro serve as a member of a grand or petit jury.[7]

The significance of all of this was apparently brought sharply to Judge Dawson's attention by the January 1960 decision of the Texas Court of Criminal Appeals in Stoker v. State, Tex.Cr.App., 1960, 331 S.W.2d 310, in which a criminal conviction was reversed and the indictment dismissed because over the past 50 years no Negro had been included in the grand jury list.[8] Aware that Jury Commissioners had not carried out their instructions to select persons for the list without racial discrimination, and thus that the indictment of Petitioner would not pass muster under *Stoker*, Judge Dawson appointed five new Jury Commissioners, one of whom, Mrs. Betty

---

6. For consistency we shall use the terminology of Mr. Justice Reed in Cassell v. State of Texas, supra, 339 U.S. at 285 n. 9, 70 S.Ct. at 630 n. 9, 94 L.Ed. at 846 n. 9, also used in other Texas grand jury race cases, Carter v. State of Texas, 1900, 177 U.S. 442, 20 S.Ct. 687, 44 L.Ed. 839; Martin v. State of Texas, 1906, 200 U.S. 316, 26 S.Ct. 338, 50 L.Ed. 497; Thomas v. State of Texas, 1909, 212 U.S. 278, 29 S.Ct. 393, 53 L.Ed. 512; Smith v. State of Texas, supra; Hill v. State of Texas, 1942, 316 U.S. 400, 62 S.Ct. 1159, 86 L.Ed. 1559; Akins v. State of Texas, supra; Hernandez v. State of Texas, supra. The "list" refers to the 16 selected by the Jury Commissioners. The grand jury "panel" refers to the 12 thereafter selected by the Judge.

7. The Jury Commissioners seldom placed the name of a Negro on a jury venire for petit juries, and in those few instances the Negro was always excused.

8. In addition to noting this long-continued exclusion, the Texas Court of Criminal Appeals stated:

"It further appears that although the jury commissioners testified that in the selection of the grand jury panels they did not arbitrarily exclude Negroes, the grand jury commissioners made no effort to determine their qualifications."

331 S.W.2d at 311. The Court then cited Norris v. State of Alabama, 294 U.S. 587, 55 S.Ct. 579, 79 L.Ed. 1074; Cassell v. State of Texas, supra; Hill v. State of Texas, supra; Smith v. State of Texas, supra; Patton v. State of Mississippi, 332 U.S. 463, 68 S.Ct. 184, 92 L.Ed. 76; and Eubanks v. State of Louisiana, 1958, 356 U.S. 584, 78 S.Ct. 970, 2 L.Ed.2d 991.

Smith, was a Negro. Judge Dawson, as his later testimony revealed, included Mrs. Smith on the new Commission for the purpose of complying with the mandate of the Court of Criminal Appeals in *Stoker* (see note 8, supra). This new Jury Commission then proceeded to select and put upon the list 16 prospective jurors, two of whom were Negroes. Those two Negroes were among the 12 on the panel chosen by Judge Dawson. It was this grand jury which subsequently re-indicted Petitioner.[9]

On the basis of that second indictment, Petitioner was brought to trial. His court-appointed counsel moved to quash the indictment because there had been impermissible inclusion of Negroes on the grand jury. An evidentiary hearing was held by Judge Dawson which included testimony from him and one of the Jury Commissioners, Cooley. The motion was denied, Brooks was tried and found guilty. On direct appeal, the Texas Court of Criminal Appeals, on rehearing, Judge Davidson dissenting, rejected this claim of unconstitutional racial inclusion. Brooks v. State, Tex.Crim.App., 1960, 342 S.W.2d 439, on rehearing, 1961, 342 S.W. 2d 442.

It rounds out the procedural picture to state here that on the federal habeas, Chief Judge Connally also held a full evidentiary hearing which included the transcript of the State Court proceeding and testimony on the motion to quash. He also considered affidavits, 28 U.S.C.A. § 2246, of Jury Commissioners Bailey, Persons, and Cox. No testimony by affidavit or otherwise came from Mrs. Betty Smith, the Negro Commissioner.

In denying the petition, Judge Connally's opinion by a sort of built-in syllabus held that under the circumstances there was no systematic and purposeful inclusion of a fair or otherwise predetermined

number of Negroes by the Jury Commission and that the practice followed was in conformity with approved Texas—and necessarily federal constitutional—procedure. 241 F.Supp. at 747–748.

### III.

This brings us to an examination of the details of the evidence to determine factually the extent, if at all, to which race entered the minds of one or more of the Commissioners in the selection of the two Negros for the list. The Federal District Judge by an exception which almost swallows up the whole pinpointed it this way:

"The facts are without dispute except as to a single point, and that is an exceedingly fine one; that concerns the motivating factors—or the mental processes, * * * which actuated the jury commissioners in selecting the two colored persons * * * [for the list]."

241 F.Supp. at 743.

There is, first, the matter of Judge Dawson's instructions to the new Jury Commissioners.[10] As to them, Judge Dawson testified: "Generally, for the last few terms of court in this county * * * I have told * * * [the Jury Commission] that * * * [Negroes] could not be excluded, and I have told them, of course, that they couldn't be put on or kept off on account of race, but I had told them that they couldn't any longer operate with them excluded from juries." In crediting fully this testimony Judge Connally found that Judge Dawson did not instruct the Commissioners that a Negro must be included on the list. 241 F.Supp. at 744–745, 747 & n. 2.

But since the inclusion of the Negroes on the list is not so much a question of the instructions given by the Court as it is a question of the understanding by

---

9. Although a matter of no apparent significance, our record does not indicate that any formal action was taken toward quashing or dismissing the first indictment.

10. The record does not contain the actual instructions as given or, for that matter, whether a stenographic record was or is customarily made. 241 F.Supp. at 744 n. 1. Judge Connally, with evident basis, credited Judge Dawson's later testimony as to his recollection of what his instructions were.

the Commissioners of such instructions or their legal obligations, it is not either to discredit Judge Dawson nor to raise a factual controversy to recognize frankly that Commissioner Cooley's understanding was quite different. Commissioner Cooley, the sole one to testify subject to cross examination at a time then within 4½ months of the events under scrutiny, was quite emphatic. Regardless of the instructions and of where he might have gotten the information concerning standards for selection, Commissioner Cooley acknowledged that he purposely included some Negroes in making his selection. Answering the prosecutor's questions on cross examination, he testified that he did so in an effort to avoid showing discrimination on the basis of race. On redirect examination, he categorically answered affirmatively when asked "Did you put more Negroes than one on this grand jury because you thought you were under a mandate so to do?" He adhered to this on recross examination by stating, "It was my understanding that we were supposed to have some colored people on the grand jury * * * and so I tried to put some on there." On redirect he capped this by acknowledging that he "deliberately put some Negroes on the grand jury."

Considerable corroboration to Cooley's frank testimony comes from the contemporaneous action of Court and counsel. Perhaps—in view of the affidavits given five years later for the federal habeas hearing—all took too much for granted. But at the time of the State Court hearing all seemed to think that Cooley spoke for all.[11]

And certainly that was true of Commissioner C. C. Bailey whose 1965 affidavit was offered by Petitioner in the federal habeas hearing. Undoubtedly undertaking to gear his action (and that of the others) to the instructions earlier given by Judge Dawson to them, he was emphatic "that the judge said we should put some Negroes on the juries."[12]

But on the federal habeas hearing, a sharp conflict among the Commissioners developed. The State, as 28 U.S.C.A. § 2246 permits, submitted the affidavits of Commissioners J. E. Persons, Jr., and Leon Cox. Persons stated that he recalled Judge Dawson "making statements with regard to not showing any prejudice because of race, in determining our selection of jurors." The selection of jurors was based strictly on his knowledge of people in his area, and he was certain that he did not "include or exclude anyone from the jury duty for any reason other than their minimum qualifications to serve as jurors." Persons stated further that if there were any colored people from his area which he did not know, Mrs. Smith, the Negro woman on the commission, would suggest that they be nominated to serve and their names were

---

11. All five Commissioners had been subpoenaed, but after this colloquy, their testimony was not taken:

"[Petitioner's counsel]: If Your Honor please, we have had the other members of that jury commission subpoenaed, but under Mr. Cooley's testimony I think it is just a waste of the Court's time and we will let the Court—
"The Court: It would be just repetitious.
"Gentlemen, as I told you, I realize that it is a serious motion—the motion presents a serious problem, but we have done all we can do, and I will overrule the motion and give you your exception."

12. Describing Judge Dawson's instructions and the actions of the Jury Commission, Bailey's affidavit had this to say:

"[Judge Dawson] instructed us that all jurors should be qualified to serve on a jury, and he did say regardless of color they would not be excused, and we also had a Negro lady as a member of our jury commission; that some members of the commission told Betty Smith, the Negro lady who was on the commission with us, to name some Negroes that would qualify and she did; that the Judge further congratulated Betty Smith in telling her she was the first Negro to ever sit on the jury commission in Van Zandt County. That the Judge said we should put some Negroes on the juries."

placed on the list. His affidavit summed it up in this fashion:

> "In our selection of Grand Jurors, there were certainly no prejudices either against or for any citizens of the county, but our determinations were made solely on the basis of qualifications and definitely not made or even considered on the basis of a person's color or race."

Commissioner Leon Cox also stated that Judge Dawson informed the Commissioners "that we were in no way to discriminate as to the jurors we selected with regard to the race or nationality of the individual persons, who might be selected." He recalled definitely Judge Dawson saying that "we could not purposely include or exclude members of the colored race from either serving on a grand jury or as members of petit jury panels." Recognizing that several Negroes were actually included on the list, Commissioner Cox stated that no one was included because of his race. Although Cox himself had personal knowledge of the race of most prospective jurors, his own selections "were not made with any intent to exclude any members of the colored race, and if any member of the colored race was purposely included as a jury panelist * * * it was only because of his good citizenship and qualifications, which were considered in his or her selection."

Judge Connally was alive to the difficulties of resolving this factual dispute. "If inquiry must be made into the mental processes of the grand jurors, the evidence—as might be expected—is not satisfactory. * * * While I do not doubt that Judge Dawson was hopeful that one or more Negroes would be included on this grand jury, * * * from his testimony, supported by that of Commissioners Persons and Cox, I find that he did not instruct the commissioners that this must be done." 241 F.Supp. at 747. Of the evidence from Commissioners Cooley and Bailey, Judge Connally stated:

> "It is not surprising that Commissioners Bailey and Cooley, laymen unacquainted with the refined distinctions drawn by the appellate courts in this area of the law today, well might have misconstrued an instruction 'not to exclude' as meaning 'to include'."

Ibid. Thereafter, summarizing the contrary testimony of Commissioners Persons and Cox, Judge Connally concluded: "I accept the testimony of these last two named commissioners as being accurate and consistent with that of Judge Dawson." Ibid.

But we think it is important to emphasize here that in crediting Commissioners Persons and Cox and Judge Dawson, it was not the purpose of Judge Connally to discredit Cooley and Bailey as to what they understood and what they actually did. The credibility choice concerned primarily the nature of the instructions given by Judge Dawson. Judge Connally did not minimize the Cooley-Bailey evidence. To the contrary, Judge Connally indicates quite plainly that these two Commissioners, while misconstruing Judge Dawson's instructions, were influenced strongly by considerations of race.[13]

The upshot of this is, we think, that we must treat this case as one in which a substantial element of a collective body

---

13. "Thus I find that some, if not all, of the five jury commissioners were acquainted with the persons composing the list of sixteen, and knew that two were of the colored, and fourteen of the white race; that *two of the five commissioners* misconstrued the instructions of the trial court and *felt that one or more negroes should of necessity be included*, and may have been influenced to an unknown extent by reason of this fact; that two of the five commissioners properly construed the trial court's instruction and selected the two colored members, as well as the fourteen white members, solely because of their qualification, free of any racial consideration; and that there is no evidence tending to show that the fifth commissioner was influenced by any improper consideration, whether of race or otherwise."
241 F.Supp. at 747. (emphasis supplied).

purposely selected two members for the list for the reason, among others, that they were Negroes.

## IV.

Although the issue here is the validity of the new 1960 grand jury, not the former one, the propriety of the action taken by Judge Dawson and the new Jury Commissioners is vividly demonstrated by considering the alternative courses open to Judge Dawson at these steps.

This process starts with the query: what would have happened had Judge Dawson not required the selection of a new grand jury and petitioner had been tried and convicted under the indictment of the former 1959 grand jury? The answer is quickly found. Following the technique having contemporary vitality that figures speak and when they do, Courts listen,[14] it is a dead certainty that with the great array of cases from Neal v. State of Delaware, 1881, 103 U.S. 370, 26 L.Ed. 567, on down through Swain v. State of Alabama, 1965, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (many of which are therein cited), the history of not a single Negro grand juror ever serving in Van Zandt County having a population of 10% Negro would not have passed muster in any Court, State or Federal, on direct appeal or habeas corpus. Judge Dawson was so right in seeing that Stoker v. State, supra, made convictions under indictments of the former grand jury a constitutional nullity.

Faced with this legal certainty, what was Judge Dawson to do? One thing is positive. There was no way to eradicate the constitutional infection of that grand jury. Nothing could save it. Nothing could validate its actions against the attack of persons having requisite standing. What was needed was an entirely new grand jury, a grand jury which almost to a legal certainty had been validly, constitutionally selected and impaneled.

 This posed practical problems. But the existence of a practical problem in the administration of justice, and particularly criminal justice, presents no obstacle as the law seeks reasonable, practicable means of meeting practical problems with complete fidelity to the Constitution. For the Constitution is a living document undertaking to assure basic freedoms and rights among men in their daily—which means practical—lives. In the face of these practicalities, Judge Dawson knew better than anyone else that the infirmity of the former grand jury was the total absence of any Negro on the list or panel—a result completely consistent with the historical pattern of that county. He knew also that this result had obtained over the years despite his recurring instructions to each new Jury Commission against racial discrimination. Suppose Judge Dawson had contented himself merely with repeating those instructions to a new Jury Commission made up solely of white persons of the white race. Suppose also that this new Jury Commission had once again filed its list of 16 persons none of whom were Negroes. Holding that such historical statistics effectively serve the role of making out a prima facie case, United States v. Wiman, 5 Cir., 1962, 304 F.2d 53, 65–66, Smith v. State of Texas, supra; Hill v. State of Texas, supra; Hernandez v. State of Texas, supra; Eubanks v. State of Louisiana, 1958, 356 U.S. 584, 78 S.Ct. 970, 2 L.Ed. 2d 991, and for that matter our very re-

14. United States v. State of Alabama, 5 Cir., 1962, 304 F.2d 583, 586, aff'd, 371 U.S. 37, 83 S.Ct. 145, 9 L.Ed.2d 112; United States v. Wiman, 5 Cir., 1962, 304 F.2d 53, 66–67, cert. denied, 1963, Wiman v. Seals, 372 U.S. 915, 924, 83 S.Ct. 717, 741, 9 L.Ed.2d 722, 729; United States v. Edwards, 5 Cir., 1964, 333 F.2d 575, 579 at 581 (dissenting opinion); United States v. State of Mississippi, S.D.Miss., 1964, 229 F.Supp. 925, 974 at 993 (dissenting opinion), rev'd, 1965, 380 U.S. 128, 85 S.Ct. 808, 13 L.Ed.2d 717; Williams v. Wallace, M.D.Ala., 1965, 240 F.Supp. 100, 108 n. 6; Bush v. Martin, S.D.Tex., 1966, 251 F.Supp. 484, & n. 43 [C.A. No. 63-H-266, Jan. 6, 1966, p. 26 & n. 43].

cent en banc cases,[15] make it quite plain that the constitutional mortality rate for such a grand jury list would have been high. For once again, against the historical pattern and the 90/10 racial composition of the county, all there would have been is the repeated protestations, unctuous or otherwise, of Judge and Jury Commissioners that the selections were made in good faith without regard to race or color. But judicial history demonstrates that such protestations would simply not destroy the prima facie case based on the historical statistics.[16] Anticipating as he would be bound to do that the second of such grand juries would fare no better than the former one, Judge Dawson would have been required to ignore its indictments too. Then what? Was he to repeat this process against the hope that someday, someway, one of these Jury Commissions—aware of constitutional imperatives only as they obtained definitive instruction from the Court—would select a list with one or more Negroes on it?

Faced with this problem which was both practical and of profound importance to a community naturally concerned simultaneously about its peace and welfare and the protection of society through the constitutional prosecution of offenders, one obvious thing was open. And this Judge Dawson did. Breaking with history, he named for the first time a Negro to the Jury Commission. If—and there is no real if any more—the

law is to see what all others see, Bailey v. Drexel Furniture Co., 1922, 259 U.S. 20, 37, 42 S.Ct. 449, 450, 66 L.Ed. 817, 819,[17] is not the law large enough to acknowledge that Judge Dawson expected this to bring forcibly to the attention of all of the Jury Commissioners the vital meaning of his instructions against racial discrimination? Is it to the discredit of Mrs. Smith that, besides having all of the statutory qualifications for a Jury Commissioner, Art. 333, she was a Negro? What better way would there be to make certain that the Jury Commission, as an entity, is made aware of the names and availability of potential jurors, and especially those of a significant element of the community who historically had been ignored?

And what of the action of the Jury Commission and its members? Was it not entitled to consider Mrs. Smith, the Negro, both as a reminder of the court-instructed duty not to discriminate on account of race and, at the same time, as the most likely adviser as to the source of prospective Negroes qualified for jury selection? And assuming—a matter discussed in Part V—that there was an obligation on the Commission to make certain that in the list of 16 there was a fair representation of the community, how was this to be done without consciously thinking in terms of race when that community has, as a significant element, 10% Negroes who had, up to that

15. Scott v. Walker, supra, 358 F.2d at 568; Davis v. Davis, supra, 361 F.2d 770; cf. Billingsley v. Clayton, supra, 359 F.2d at 18 & cases cited in n. 3.

16. Smith v. State of Texas, supra, 311 U.S. at 132, 61 S.Ct. at 166, 85 L.Ed. at 87; Hernandez v. State of Texas, supra, 347 U.S. at 481, 74 S.Ct. at 671, 98 L.Ed. at 872; Norris v. State of Alabama, 1935, 294 U.S. 587, 598, 55 S.Ct. 579, 583, 79 L.Ed. 1074, 1081; Eubanks v. State of Louisiana, supra, 356 U.S. at 587, 78 S.Ct. at 973, 2 L.Ed.2d at 994; United States ex rel. Seals v. Wiman, supra, 304 F.2d at 65; Davis v. Davis, supra, 361 F.2d at 773.

17. See, e. g., Hamer v. Campbell, 5 Cir., 1966, 358 F.2d 215; 1966, Gomillion v. Lightfoot, 5 Cir., 1959, 270 F.2d 594, 608 (dissenting opinion), rev'd, 1960, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110; United States v. Mississippi, S.D.Miss., 1964, 229 F.Supp. 925, 998 (dissenting opinion), rev'd, 1965, 380 U.S. 128, 85 S. Ct. 808, 13 L.Ed.2d 717. As Mr. Justice Frankfurter put it:
"If one factor is uniform in a continuing series of events that are brought to pass through human intervention, the law would have to have the blindness of indifference rather than the blindness of impartiality not to attribute the uniform factor to man's purpose."
Cassell v. State of Texas, supra, 339 U.S. at 293, 70 S.Ct. at 634, 94 L.Ed. at 850 (Frankfurter, J., concurring).

time, been ignored as the victims of unconstitutional discrimination?

These are, as we have said, practical problems encountered inescapably in making a color-blind Constitution work. How well do these intellectually honest practical responses jibe with the Constitution? With the law and its obligations?

## V.

■■ In answering these questions, we know first that it is a constitutional imperative that the jury, grand or trial, fairly represent the community.

"It is part of the established tradition in the use of juries as instruments of public justice *that the jury be a body truly representative of the community*. For racial discrimination to result in the exclusion from jury service of otherwise qualified groups not only violates our Constitution and the laws enacted under it but is at war with our basic concepts of a democratic society and a representative government."

Smith v. State of Texas, supra, 311 U.S. at 130, 61 S.Ct. at 165, 85 L.Ed. at 86. (Emphasis added.) This clear imperative received renewed attention and recognition in our en banc cases. See Scott v. Walker, supra, 358 F.2d at 564. As we said in Billingsley v. Clayton, supra, 359 F.2d at 18 [No. 22304], "The aim and purpose of the law is to obtain juries which truly represent a cross-section of the community * * *." So said Mr. Justice Murphy in *Akins:* "The equal protection clause guarantees petitioner * * * the right to have Negroes considered as prospective veniremen * * * [i]f a jury is to be fairly chosen from a cross section of the community * * *." 325 U.S. at 409, 65, 1276 S.Ct. at 1282, 89 L.Ed. at 1699 (dissenting opinion). And again in Fay v. People of State of New York, 1947, 332 U.S. 261, 67 S.Ct. 1613, 91 L.Ed. 2043:

"The equal protection clause of the Fourteenth Amendment prohibits a state from convicting any person by use of a jury which is not impartially drawn from a cross-section of the community. * * * But there is a constitutional right to a jury drawn from a group which represents a cross-section of the community."

332 U.S. at 296, 299, 67 S.Ct. at 1632, 1633, 91 L.Ed. at 2064, 2066 (dissenting opinion). And so implied Mr. Justice Frankfurter in Cassell:

"*Assuming that the grand-jury pool fairly enough reflects the racial composition of the community*, there is no basis for a claim of constitutional discrimination if without design it comes to pass that a particular grand jury has no representation of a particular race."

339 U.S. at 291, 70 S.Ct. at 633, 94 L.Ed. at 849. (Emphasis added.) This concept of the jury as a cross-section of the community was recognized in Glasser v. United States, 1942, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680, 690; Thiel v. Southern P. Co., 1946, 328 U.S. 217, 66 S.Ct. 984, 90 L.Ed. 1181; and Ballard v. United States, 1946, 329 U.S. 187, 67 S.Ct. 261, 91 L.Ed. 181, 183, all federal jury cases involving less exacting statutory problems in the exercise of the Court's supervisory power over federal Courts, but all drawing on Smith v. State of Texas [18]

18. Glasser v. United States, supra, 315 U.S. at 84–86, 62 S.Ct. at 472, 86 L.Ed. at 707:
"Our notions of what a proper jury is have developed in harmony with our basic concepts of a democratic society and a representative government. For 'It is part of the established tradition in the use of juries as instruments of public justice that the jury be a body truly representative of the community.' Smith v. [State of] Texas, 311 U.S. 128, 130, 61 S.Ct. 164, 165, 85 L.Ed. 84 [86].
" * * * *
"And, its exercise must always accord with the fact that the proper functioning of the jury system, and, indeed, our democracy itself, requires that the jury be a 'body truly representative of the community', and not the organ of any special group or class. If that requirement is observed, the officials charged with choosing federal

which inescapably involves constitutional principles.

■ And this concept imposes the corollary duty described in Avery v. State of Georgia, 345 U.S. 559, 561, 73 S.Ct. 891, 892, 97 L.Ed. 1244, 1247:

"The Jury Commissioners, and the other officials responsible for the selection of this panel, were under a constitutional duty to follow a procedure —'a course of conduct'—which would not 'operate to discriminate in the selection of jurors on racial grounds.' Hill v. [State of] Texas [1942], 316 U.S. 400, 404 [62 S.Ct. 1159, 1161, 86 L.Ed. 1559]. If they failed in that duty, then this conviction must be reversed—no matter how strong the evidence of petitioner's guilt. That is the law established by decisions of this Court spanning more than seventy years of interpretation of the meaning of 'equal protection.' "

Similarly, see Akins v. State of Texas, supra, 325 U.S. at 403, 65 S.Ct. at 1279, 89 L.Ed. at 1696:

"But such defendants are entitled to require that those who are trusted with jury selection shall not pursue a course of conduct which results in discrimination 'in the selection of jurors on racial grounds.' "

■ The cases—the long, long line of cases borne of a century's struggle against this evil of race discrimination—make quite clear that this duty is not one to be exercised in the abstract. On the contrary, it is the reality of the world, indeed, at times the segregated world, which must be kept in mind. As with the problem dealt with by us here, the constitutional imperative is the by-product of experience in finding a practicable means of overcoming the evil consistent with constitutional demands.

Thus in many of these cases, answering the strong prima facie case made by startling statistics, the jury officials have made two principal replies. The first has generally been that of protestation of innocence and good faith. But the Courts have consistently held that statistics speak louder than the jury commissioners. See note 16, supra.

The second, often a part of the first as an effort to bolster the sometimes unctuous claim of good faith, is the truthful assertion of the fact that more, or some, Negroes could not have been selected because the jury officials did not know of them, know who or where they were and hence knew no qualified persons from whom choices could be made.

■ But the law has never contented itself with any such hollow, shallow ignorance. To the contrary, the law—the very demands of the Constitution—so developed as to place a specific, tangible, identifiable burden on jury-choosing officials. It is not enough to choose from those they see. They must uncover the source of competent jury prospects from all significantly identifiable elements of the community. Innocent ignorance is no excuse. It neither shields the jury's action—verdict or indictment—from scrutiny, nor does it justify the half-hearted, obviously incomplete performance of duty by the officials.

The Court has long been aware of this see-no-evil — hear-no-evil — find-no-evil approach. Thus Mr. Justice Black stated for a unanimous Court in Smith v. State

jurors may exercise some discretion to the end that competent jurors may be called. But they must not allow the desire for competent jurors to lead them into selections which do not comport with the concept of the jury as a cross-section of the community. Tendencies, no matter how slight, toward the selection of jurors by any method other than a process which will insure a trial by a representative group are undermining processes weakening the institution of jury trial, and should be sturdily resisted."

Accord, Thiel v. Southern P. Co., supra, 328 U.S. at 220, 66 S.Ct. at 985, 90 L.Ed. at 1184–1185; Ballard v. United States, supra, 329 U.S. at 195, 67 S.Ct. at 265, 91 L.Ed. at 187.

of Texas, supra, 311 U.S. at 132, 61 S.Ct. at 166, 85 L.Ed. at 87:

> "Where jury commissioners limit those from whom grand juries are selected to their own personal acquaintance, discrimination can arise from commissioners who knew no negroes as well as from commissioners who know but eliminate them. If there has been discrimination, whether accomplished ingeniously or ingenuously, the conviction cannot stand."

And in Cassell v. State of Texas, supra, 339 U.S. at 289–290, 70 S.Ct. at 632, 94 L.Ed. at 847–849, so important in the Collins structure, Mr. Justice Reed for the Court [19] extolled the principle so eloquently stated by Mr. Justice (later Chief Justice) Stone in Hill v. State of Texas, supra, 316 U.S. at 404, 62 S.Ct. at 1161, 86 L.Ed. at 1562:

> "They [the jury commissioners] made no effort *to ascertain* whether there were within the county members of the colored race qualified to serve as jurors, and if so who they were. They thus failed to perform their *constitutional duty* * * * not to pursue a course of conduct in the administration of their office which would operate to discriminate in the selection of jurors on racial grounds. Discrimination can arise from the action of commissioners who exclude all negroes whom they do not know to be qualified and who neither know nor seek to learn whether there are in fact any qualified to serve. In such a case discrimination necessarily results where there are qualified negroes available for jury service."

We have adhered to this principle in United States ex rel. Seals v. Wiman, su-

pra, 304 F.2d at 65–67; Scott v. Walker, supra, 358 F.2d at 573, and Davis v. Davis, supra, 361 F.2d at 773, where prima facie cases on the statistics became conclusive with the revelation that the commissioners had failed in "their duty to familiarize themselves fairly with the qualifications of the eligible jurors of the county." Cassell v. State of Texas, supra, 339 U.S. at 289, 70 S.Ct. at 632, 633, 94 L.Ed. at 848.[20]

 But inaction, evidenced by the statistics or by the commissioners' admissions that they have failed to acquaint themselves with the qualifications of Negroes, cannot be cured by the symbolic or mechanical action which some commissioners defensively resort to. Pointing to the presence of Negroes on the lists or juries, these officials assert compliance with their constitutional duty. However, guarding against sophisticated as well as simple-minded discrimination, Lane v. Wilson, 1939, 307 U.S. 268, 275, 59 S.Ct. 872, 876, 83 L.Ed. 1281, 1287, the Courts have been alert to discover from the commissioners' statements, thought to be self-serving, either ill-motivated or misguided action. On the one hand, the attempt by commissioners to avoid the prima facie case arising from total exclusion by systematically including a token number of Negroes is sure to be condemned. Cf. Akins v. State of Texas, supra; Scott v. Walker, supra, 358 F.2d at 571; Brown v. Allen, 1953, 344 U.S. 443, 472, 73 S.Ct. 397, 415, 97 L.Ed. 469, 496. On the other hand, though the Courts in speaking of the commissioners' duty to familiarize themselves with the qualifications of members of significant racial groups have emphasized that proportional repre-

---

19. The Court reversed the conviction and quashed the indictment on this ground even though the statistics did not themselves bespeak a prima facie case of exclusion. Mr. Justice Clark concurred in the Court's opinion to this extent. 339 U.S. at 298, 70 S.Ct. at 637, 94 L.Ed. at 853.

20. And there was no departure from this principle in Swain v. State of Alabama,

supra, where in finding no prima facie case of exclusion, the Court noted that there was no admission by the jury commissioners (or other evidence showing) that they had few Negro acquaintances or had only used as sources lists furnished by white organizations. 380 U.S. at 207 n. 4, 85 S.Ct. at 829 n. 4, 13 L.Ed. at 766 n. 4.

sentation is not required,[21] the good faith but misguided effort of commissioners who failed to heed this caveat and aim mechanically at proportional representation will likewise be condemned as a form of exclusion in the guise of limited inclusion. Cf. Cassell v. State of Texas, supra, 339 U.S. at 286–287, 70 S.Ct. at 631, 94 L.Ed. at 847; Swain v. State of Alabama, supra, 380 U.S. at 208, 85 S.Ct. at 829, 13 L.Ed.2d at 766. In short, neither symbolic nor proportional representation is permitted. Representation must be the product of either "the operation of an honest exercise of relevant judgment or the uncontrolled caprices of chance." Cassell v. State of Texas, supra, 339 U.S. at 291, 70 S.Ct. at 633, 634, 94 L.Ed. at 849 (Frankfurter, J., concurring).

█ Thus, the queries are answered: the Constitution requires (a) a fair cross section and (b) to attain that cross section, jury selectors must become acquainted with that community's human resources, which is to say, significant elements—significant racial elements—of that community. That cannot be done without a conscious recognition of that element's existence.

## VI.

Thus we are brought face-to-face with our prior decision in Collins v. Walker, 5 Cir., 1964, 329 F.2d 100, on rehearing, 1964, 335 F.2d 417, cert. denied, 379 U.S. 901, 85 S.Ct. 189, 13 L.Ed.2d 175.[22] What we declared the legal principles to be, rather than the result reached in that particular case, is the decisive thing. In a variety of ways, we declared that purposeful *inclusion* of Negroes in a grand jury list of twenty discriminated against a Negro accused and hence the indictment returned by a grand jury drawn from that list was constitutionally invalid.

Involved in *Collins* was grand jury selection procedures in Jefferson Davis Parish, Louisiana. Under the Louisiana statutes then effective, the Jury Commissioners were to compile a general venire list of 300 persons from which they were to select the names of 20 citizens qualified to serve as grand jurors. Once the Commissioners have compiled this 20-man "list of grand jurors," [23] the Judge selects one as the foreman and 11 more are drawn at random by the sheriff to form the grand jury of 12. But the list of grand jurors was selective, not at random or by chance.[24]

At the time of the alleged commission of the offense by Collins, the current grand jury had no Negroes on it. The Jury Commissioners thereupon selected a new list of grand jurors. The several Jury Commissioners, apparently acting independently, purposely included some persons because they were Negroes, so that out of the 20 on the list of grand jurors, six were Negroes. In drawing of the 11 names (besides the foreman), the names of five of these six Negroes were drawn, making the composition of the grand jury seven white persons and

21. Martin v. State of Texas, supra, 200 U.S. at 321, 26 S.Ct. at 339, 50 L.Ed. at 499; Akins v. State of Texas, supra, 325 U.S. at 403, 65 S.Ct. at 1279, 89 L.Ed. at 1696; Cassell v. State of Texas, supra, 339 U.S. at 287, 70 S.Ct. at 631, 94 L.Ed. at 847; Hernandez v. Texas, supra, 347 U.S. at 482, 74 S.Ct. at 672, 98 L.Ed. at 872; Swain v. State of Alabama, supra, 380 U.S. at 208, 85 S.Ct. at 829, 13 L.Ed. 2d at 766; United States ex rel. Seals v. Wiman, supra, 304 F.2d at 67; Scott v. Walker, supra, 358 F.2d at 571; Billingsley v. Clayton, supra, 359 F.2d at 18; Davis v. Davis, supra, 361 F.2d at 773.

22. The original opinion, not officially published, was withdrawn and a revised opinion substituted therefor, 329 F.2d 100. But it is published as Appendix A to Judge Dawkins' dissenting opinion on the second rehearing, 335 F.2d 417 at 429.

23. For consistency and ease of reference, we follow this same terminology. See 329 F.2d at 104 n. 2, LSA–R.S. 15:180.

24. As the addendum to Judge Dawkins' dissent shows, 335 F.2d at 428, LSA–R.S. 15:180, was amended by Act 161 of 1964 to require that the 20 names to make up the list of grand jurors be drawn at random by chance from the general venire list of 300.

five Negroes. On this finding [25] the Court, speaking through Judge Rives, had this to say:

> "Six Negroes were deliberately included in this list of twenty because of their race. When to this circumstance is added the additional facts then known to the jury commissioners that the grand jury to be chosen from that list of twenty was to consider whether to return an indictment against Collins, and that no other case was scheduled to be considered by that grand jury, the conclusion becomes inescapable that in the organization of the grand jury which indicted Collins there was discrimination against him because of his race or color."

329 F.2d at 105.

This Court finally concluded that this broad and sweeping result was compelled by Cassell v. State of Texas, 1949, 339 U.S. 282, 70 S.Ct. 629, 94 L.Ed. 839.[26] Its reasoning is reflected by its synthesis of that 3–1–3–1 decision:

> " * * * As further observed in Cassell, the grand-jury commissioners for 21 consecutive lists subsequent to the Hill case had limited Negroes in the list of 16 selected for grand jury service to not more than 1 on each grand jury. 339 U.S. at [282] 285, 286, 70 S.Ct. 629. Mr. Justice Reed said that, 'If, notwithstanding this caution by the trial court judges, commissioners should limit proportionally

the number of Negroes selected for grand-jury service, such limitation would violate our Constitution. Jurymen should be selected as individuals, on the basis of individual qualifications, and not as members of a race.' 339 U.S. 286, 70 S.Ct. 631. ' * * * the Constitution requires only a fair jury selected without regard to race. Obviously the number of races and nationalities appearing in the ancestry of our citizens would make it impossible to meet a requirement of proportional representation. Similarly, since there can be no exclusion of Negroes as a race and no discrimination because of color, proportional limitation is not permissible.' 339 U.S. 286, 287, 70 S.Ct. 631–632. 'Proportional racial limitation is therefore forbidden. An accused is entitled to have charges against him considered by a jury in the selection of which there has been neither inclusion nor exclusion because of race.' 339 U.S. 287, 70 S.Ct. at 632. Chief Justice Vinson and Justices Black and Clark concurred in the opinion of Mr. Justice Reed. Justices Burton and Minton concurred in the opinion of Mr. Justice Frankfurter, who said: 'It (the Constitution) does command that no State purposefully make jury service turn on color.' 339 U.S. 291, 70 S.Ct. 634. 'The basis of selection cannot consciously take color into account.' 339 U.S. 295, 70 S.Ct. 636. Mr. Justice Clark, also concurring, rec-

---

25. In all three of the opinions (see note 21, supra), the Court struggled with the correct reading of the record as to whether the Jury Commissioners had selected the 20 names for the list of grand jurors from the general venire of 300 or from some other source. Compare 335 F.2d 436 (Dawkins, J., concurring), with 335 F.2d 421, 427 (Dawkins, J., dissenting). But highlighting the sweeping nature of its ruling prohibiting purposeful inclusion, the Court concluded that this factual controversy was immaterial. See, e. g., 329 F.2d at 104, 335 F.2d at 419.

26. In its first, withdrawn, opinion the Court relied on the broad language of *Cassell*, but acknowledged, without elaboration, that *Cassell* was distinguish-

able on the facts. 335 F.2d at 433. This factual distinction seems to have evaporated in the Court's third, rehearing opinion where the Court concludes that "[t]he main difference between this Collins case and the Cassel case is that in Cassell one Negro was purposefully placed on the list of sixteen * * * while in Collins six Negroes were purposefully placed on the list of twenty." 335 F.2d at 420. But perhaps even stranger than this—in light of the Court's initial and final reliance on *Cassell*—is the fact that in its second, substituted opinion the Court neither discusses nor even cites—much less relies on—*Cassell*. Thus, even to the Court which eventually relied on it, *Cassell* was slow in generating its momentum.

ognized the holding that there must be no 'purposeful systematic limitation of the number of Negroes on grand juries,' 339 U.S. 296, 70 S.Ct. 636; and 'that representation on the grand jury by race in proportion to population is not permissible for there must be "neither inclusion nor exclusion because of race." ' 339 U.S. 298, 70 S.Ct. 637. Mr. Justice Jackson dissented on the ground that the defendant had not been harmed by the method of selection of the grand jury. 339 U.S. 305, 70 S.Ct. 629."

335 F.2d 419–420.

That this result came only after a struggle with great difficulty is revealed not only by the number of opinions and the sharp division among the Judges.[27] But it is more vividly revealed by the Court's efforts to reconcile that result— this outright, flat, categorical prohibition against *conscious* consideration of persons by race—with (a) the demand that the jury be a fair representation of the community and (b) the obligation of the jury-selecting agency to acquaint itself with significant racial elements.

Thus, in the initial, withdrawn, opinion, see 335 F.2d 429, there was a frank recognition of some of these contradictions.

> "State courts and jury commissions may find somewhat contradictory or confusing the doctrine forbidding the consideration of color as a basis for selecting a venire of jurors and the rule which we stated in United States ex rel. Seals v. Wiman, 5 Cir. 1962, 304 F.2d 53, 67, that 'very decided variations in proportions of Negroes and whites on jury lists from racial proportions in the population, which variations are not explained and are long continued, furnish sufficient evidence of systematic exclusion of Negroes from jury service. Brown v. Allen, 1953, 344 U.S. 443, 471, 73 S.Ct. 397, 97 L.Ed. 469.' The reconciliation lies

in the observance of the positive, affirmative duty resting upon jury commissioners and other public officials expressed in Avery v. Georgia * * * 'to follow a procedure * * * which would not "operate to discriminate in the selection of jurors on racial grounds." ' "

335 F.2d at 433–434. The Court then states that "[c]ompliance with that duty inevitably results in meeting the evidentiary test prescribed in" *Seals.* Ibid. But this analysis hardly holds water. First, *Seals* and the cases it relies on go much further than merely laying down an evidentiary rule of long-continued exclusion. They set out a duty, constitutionally imperative, to become familiar with qualified Negroes in the community. See text accompanying note 20, supra. Second, it is this duty—this constitutional imperative—not the evidentiary rule of exclusion, which conflicts with and must be reconciled with the rule of *Collins.*

Indeed, the Court must have thought as much itself for on the second rehearing[28] it all but held that there must be a conscious recognition of significant racial elements in the community. This led the Court to state:

> "Thus it may be that the 'general venire list' of three hundred persons is required to reflect a suitable cross-section of the population, and that the jury commissioners have an affirmative duty to include qualified Negroes in that list. If such a requirement and duty have once been met in compiling the 'general venire list' no repetition is necessary or even allowed in the selection of the list of twenty 'therefrom.' Certainly, as to the list of twenty, the basis of selection cannot consciously take race or color into account."

335 F.2d at 420.

How or in what manner this was to be done is an enigma wrapped in a mystery

---

27. Three by Judge Rives for the Court, one special concurrence by Judge Jones, a special concurrence by Judge Dawkins, and a dissent by Judge Dawkins.

28. In the second, substituted opinion the Court neither alludes to any conflict nor attempts any reconciliation.

in the light of Judge Jones' special concurrence which, against Judge Dawkins' vigorous dissent, made up a majority. Recognizing, as did Judge Rives' opinion, that Negroes might have to be included in the 300 general venire list, Judge Jones then stated:

> "The basis of selection cannot consciously take color into account yet, as Judge Rives so aptly says, that in the general venire list, it may be that 'the jury commissioners have an affirmative duty to include qualified Negroes in that list.' Thus it seems that perhaps *Negroes must be included* in the general venire list, *although* it will be assumed that *this is not to be done purposefully* lest the Constitution be infringed."

335 F.2d at 421. (Emphasis added.)

But notwithstanding all of these doubts and difficulties, the Court adhered to its result and basic thesis: there may not be conscious inclusion of Negroes as such in the immediate list or group out of which a grand jury is to come. This is basic to what the Court did—under no circumstances may it be regarded as dicta—and so long as it stands, it overrides the distinguishing factors thought by Judge Connally to be a permissible basis for holding *Collins* to be not decisive.

Our problem, then, essentially is whether *Cassell* and the other cases so heavily relied on in *Collins* permit or require this principle announced in *Collins*.

### VII.

Of course a consideration of *Cassell's* authoritative teaching must recognize that the several Justices made the statements which appear in the *Collins* synthesis quoted above. See text following note 26, supra. But it does not end there.

Indeed, it rather depends on what was actually involved and what the Court itself recognized to be the issues then before it.

To begin with, *Cassell* does not stand by itself. It, like Hill v. State of Texas (1942), supra; and Akins v. State of Texas (1945), supra, involved the validity of indictments of Negroes for capital offenses by grand juries in Dallas County, Texas.[29] In *Hill* the Court, reversing the Texas Court of Criminal Appeals on its fact finding that there had been no purposeful discrimination against Negroes, held that a prima facie case had been made out by the statistical evidence showing the number of white and Negro persons potentially qualified to serve and the history of a Negro never having been called to serve. The explanation given was, of course, the familiar, but unacceptable one that the Jury Commissioners did not know Negroes who were qualified to serve.

This was shortly followed by *Akins* in 1945. Directly at issue was the practice followed by the Jury Commissioners in Dallas County under instructions of the District Judge as a consequence of the Supreme Court's holding in *Hill*. The attack asserted that the Jury Commissioners purposely limited the inclusion of Negroes to one per list presumably out of a belief that this complied with the constitutional requirements ordained in *Hill*. The Supreme Court, with sharp dissents,[30] accepted the fact finding of the Texas Court of Criminal Appeals that it was not established that there was an understanding, agreement, or practice to include one, but only one, Negro in the grand jury list. Having first found, as it was later to do in 1965, Swain v. State of Alabama, supra, that the statistical disproportions were not

---

29. See Cassell v. State of Texas, supra, 339 U.S. at 293–294, 70 S.Ct. at 634, 94 L. Ed. at 850–851 (Frankfurter, J., concurring). *Cassell, Akins*, and *Hill* each were direct reviews which came up on petitions for certiorari from the judgments of the Texas Court of Criminal Appeals affirming the convictions.

30. Mr. Justice Black joined by Chief Justice Stone and a separate dissent by Mr. Justice Murphy.

sufficient to show discrimination,[31] the Court, after also holding that purposeful limitation to one Negro had not been factually established, did the obvious thing by its affirmance of the conviction. It concluded that this made it unnecessary to resolve the question whether purposeful proportional limitation is constitutionally invalid.[32]

But a further thing is clear from the Court's action. Though the Court found no purposeful *limitation* by the commissioners to one Negro per list—and this is what the Court said was the sole issue presented, 325 U.S. at 400, 65 S.Ct. at 1277, 89 L.Ed. at 1694—and thus no occasion to determine the constitutionality of such a practice, under any view of the evidence, there was purposeful *inclusion* of Negroes. For the only thing contradicting the clear testimony of some of the commissioners that they purposely set out to obtain one, and only one, Negro, 325 U.S. at 406–407, 65 S.Ct. at

1280, 89 L.Ed. at 1698, was the instruction of the Judge that Negroes must be represented, though not proportionately or symbolically.[33] And the Court implicitly approved this instruction.[34] Thus, in affirming this conviction on a record which revealed purposeful inclusion, even though the sole attack was on intentional limitation, the Court effectively, though implicitly, approved this practice.

Then along came *Cassell* in 1950. It is very important at the outset to bear in mind the Court's own limitation on the issues it was about to decide. After describing the setting of the case, Mr. Justice Reed for the Court stated:

"Certiorari was granted * * * to consider petitioner's claim that * * * Negroes were *omitted* from the list of grand jurymen either because of deliberate *limitation* by the Dallas County jury commissioners, *or* because of *failure* by the commissioners *to ac-*

---

31. The grand jury which indicted Akins was the second chosen after the *Hill* decision. In the first, one Negro had been placed on the list, but did not serve on the panel. The sole Negro placed on the list for the second served on the panel which indicted Akins. The Court noted that with 15.5% of the population being Negro, 1.8552 Negroes on each panel would constitute proportional representation, but that his figure would be reduced after Negroes not possessing the statutory qualifications were eliminated. 325 U.S. at 405–406, 65 S.Ct. at 1280, 89 L.Ed. at 1697–1698.

32. 325 U.S. at 407, 65 S.Ct. at 1281, 89 L.Ed. at 1698. Mr. Justice Murphy, refusing to accept the Court of Criminal Appeals' finding, concluded that there was intentional limitation to one Negro on the list and that this would violate the Constitution. 325 U.S. at 407, 65 S.Ct. at 1281, 89 L.Ed. at 1698 (dissenting opinion).

33. All three of the commissioners agreed that the State Judge had instructed them to include Negroes on the list:
"Commissioner Tennant: ' * * * Judge Adams never mentioned to us about putting one negro on the grand jury, or five or ten. Yes, that there must be representation for the race.'
"Commissioner Douglas: 'At that time

Judge Adams * * * made some reference or instructions about how to select the grand jury. He thought it well to select negroes on the grand jury. He said he thought it would be well to select a negro on the grand jury.' "
325 U.S. at 404 n. 4, 65 S.Ct. at 1280 n. 4, 89 L.Ed. at 1697 n. 4.
"Commissioner Wells: ' * * * Judge Adams did not tell us to put one negro or five negroes on the grand jury. Yes, we just understood to see that negroes had representation on the grand jury.' "
325 U.S. at 406, 65 S.Ct. at 1280, 89 L.Ed. at 1698.

34. The Court said:
"The history and record of this case gives evidence that the courts of Texas * * * endeavored to comply with the federal constitutional requirements as to the selection of grand juries * * *. * * * the judge, now deceased, of the criminal district court of Dallas instructed the three jury commissioners, who selected this grand jury list, as testified to by each of them, that there should be no discrmination against anyone because of his color.4"
325 U.S. at 404, 65 S.Ct. at 1279, 89 L. Ed. at 1697. Footnote 4 of the Court's opinion contains the testimony of the commissioners set out in note 33, supra.

*quaint* themselves with available Negroes."

339 U.S. at 283, 70 S.Ct. at 630, 94 L.Ed. at 845 (Emphasis added.)

The Court first took up the charge that the statistics, showing the Negroes, comprising 15.5% of the population, but only perhaps 6.5% of poll tax holders and thus qualified grand jurors, constituted only 6.7% of those on grand jury panels, established a prima facie case. The Court rejected this. "Without more it cannot be said that * * * a prima facie case of discrimination" had been made out. 339 U.S. 285, 70 S.Ct. at 631, 94 L.Ed. at 846.

The Court then took up the charge that, subsequent to *Hill,* although the State District Judges had instructed the Jury Commissioners not to discriminate on grounds of race or color, the practice in fact was to limit proportionally the number of Negroes to be listed. On this, Mr. Justice Reed for himself and Chief Justice Vinson and Mr. Justice Black, but not Mr. Justice Clark, apparently undertook to answer the question reserved in *Akins.* And in doing so, we find the expression so heavily stressed in *Collins.* Mr. Justice Reed wrote: *"Proportional racial limitation* is therefore forbidden. An accused is entitled to have charges against him considered by a jury in the selection of which there has been neither inclusion nor exclusion because of race." 339 U.S. at 287, 70 S.Ct. at 632, 94 L.Ed. at 847. (Emphasis supplied.)

But the Court, now speaking through Mr. Justice Reed by virtue of Mr. Justice Clark's concurrence, proceeds then and there to put its decision on a distinctively different and other ground.

"Our holding that there was discrimination in the selection of grand jurors in this case, however, *is based on another ground.* In explaining the fact that no Negroes appeared on this grand-jury list, the commissioners said

that they knew none available who qualified; at the same time they said they chose jurymen only from those people with whom they were personally acquainted. * * * When the commissioners were appointed as judicial administrative officials, it was their duty to familiarize themselves fairly with the qualifications of the eligible jurors of the county without regard to race and color."

339 U.S. at 288–289, 70 S.Ct. at 632, 94 L.Ed. 847–848. (Emphasis added.) That ground, of course, is the one dicussed at length in Part V, which imposes on those responsible for jury selection the constitutional duty of informing themselves of the names and availability of qualified Negro potential jurors. On the basis of the record evidence, the Court readily concluded that these Jury Commissioners had frankly disclaimed compliance with that duty. On this the Court then stated:

"The existence of the kind of discrimination described in the Hill case does not depend upon systematic exclusion continuing over a long period and practiced by a succession of jury commissioners. * * * [I]t is enough to have direct evidence based on the statements of the jury commissioners in the very case. * * * The statements of the jury commissioners that they chose only whom they knew, and that they knew no eligible Negroes in an area where Negroes made up so large a proportion of the population, prove the intentional exclusion that is discrimination in violation of petitioner's constitutional rights."

339 U.S. at 290, 70 S.Ct. at 633, 94 L.Ed. at 848–849.

It is here where Mr. Justice Clark's concurrence cuts such a big figure. He categorically declined to hold that there was a factual basis for the charge that there had been a purposeful limitation in the number of Negroes selected.[35] He

35. The record, while showing one Negro consistently on the grand jury panels, did not reveal the racial composition of the grand jury lists. 339 U.S. at 285 n. 9, 70 S.Ct. at 630 n. 9, 94 L.Ed. at 846 n. 9. Since there might have been more

therefore disassociated himself from Mr. Justice Reed's statements about "purposeful systematic limitation." He then emphasized that the "responsibility" of the Jury Commissioners "is broader than they understood it to be." 339 U.S. at 298, 70 S.Ct. at 637, 94 L.Ed. at 853. After pointing out that the record shows there were Negroes who were known, but not known personally to the Jury Commissioners and as such they were persons whom the Commissioners should have considered, Mr. Justice Clark makes clear the scope of his joinder in the Reed opinion. Of the Jury Commissioners, he said, "Their responsibility was to learn whether there were persons among the Negroes they did not know who were qualified and available for service. * * * For this reason I concur in the opinion of Mr. Justice Reed and in the judgment of reversal." Ibid.

Mr. Justice Frankfurter (joined by Justices Burton and Minton), while not joining Justices Reed and Clark in their holding that the commissioners had failed in their duty to familiarize themselves with qualified Negroes,[36] certainly did not validate the proposition that purposeful inclusion is invalid. He treated the case for what it really was: purposeful exclusion through a limited or spurious inclusion of token numbers. As he approached the case, the question was whether there was purposeful non-inclu-

sion by a "merely symbolic representation," rather than the uncontrolled caprices of choice or the exercise of relevant judgments. Although he did say, "[t]he basis of selection cannot consciously take color into account," 339 U.S. at 295, 70 S.Ct. at 636, 94 L.Ed. at 851, he delineates quite a different ground as the basis for the reversal of the conviction. As he approaches it, the prohibited conduct resulted from the Jury Commissioners' misconception of what their legal duty was. Having been instructed by the State District Judge not to discriminate, their legal error was in assuming that if one Negro was included on the grand jury list,[37] this complied with *Hill*. This, he declares, was an outright "misconception."

This analysis of *Cassell* demonstrates our *Collins* effort to compare the cases faulty in several respects.[38] First, although sentence [1] is an accurate mathematical comparison of the racial composition of the juries respectively involved, sentences [2a] and [2b] are incorrect. For the Court in *Cassell* through the Reed-constructed majority did not find that "the basis of selection was race" or even remotely come close to holding that "that was the fatal defect." To the contrary, the majority held the fatal defect to have been the failure of the Jury Commissioners consciously to seek out the names and availa-

---

Negroes on the lists than were selected by the judge for the panel, and since he was unwilling to infer discrimination on the part of the judge vis-a-vis the commissioners, Mr. Justice Clark did "not find the present record persuasive that there was such limitation." 339 U.S. at 297, 70 S.Ct. at 636, 637, 94 L.Ed. at 852.

36. Mr. Justice Frankfurter did not agree that the acknowledgment by the commissioners that they chose among their acquaintances was accompanied by any showing that they had such limited personal knowledge of Negroes as to make their choice of a few Negroes necessarily mean exclusion of others. 339 U.S. at 292, 70 S.Ct. at 634, 94 L.Ed. at 850.

37. Contrary to Mr. Justice Clark, note 25, supra, Mr. Justice Frankfurter concluded

that the consistent presence of only one Negro on each grand jury panel could only be attributed to the fact that the commissioners included no more than this number on the grand jury lists. 339 U.S. at 294, 70 S.Ct. at 635, 94 L.Ed. at 851.

38. For ease of reference, we have inserted the numbers in brackets in this Court's second (and last) *Collins* opinion:
"[1] The main difference between this Collins case and the Cassell case is that in Cassell one Negro was purposely placed on the list of sixteen from which the grand jury was selected, while in Collins six Negroes were purposely placed on the list of twenty from which the grand jury was selected. [2] [a] In both instances, the basis of selection was race. [b] That is the fatal defect." 335 F.2d at 420.

bility of Negroes having qualifications to serve. And even for the Frankfurter group, who did conclude that the basis of selection was race, the fatal defect was the misconception that to include one would be enough. None of this adds up to the proposition that consciously to include, but not arbitrarily or proportionately to limit, transgresses constitutional demands.

The statements by Justices Reed, Frankfurter, and Clark [39] so heavily relied on in *Collins* (see text following note 26, supra), on purposeful inclusion and selection totally without regard to race were all made in the context of proportional limitation. They are neither a part of nor essential to the Court's holding. And were they, then neither the ground adopted in the Reed opinion for the Court nor that advanced by the Frankfurter group would have been necessary to state. Because the record in *Cassell,* as did the record in *Akins* (see text accompanying notes 33 and 34, supra), showed without contradiction that there had been purposeful inclusion. Thus, these statements—singly or in the aggregate—can hardly represent the holding of the Court.

More than that, the Court itself has never treated *Cassell* as a declaration against conscious inclusion where this is essential to satisfy constitutional imperatives. Rather, it has been treated as a case of *exclusion* through a system of *limited inclusion.* In Brown v. Allen, 1953, 344 U.S. 443, 470–471, 73 S.Ct. 397, 414, 97 L.Ed. 469, 496, the Court stated:

"Discriminations against a race by barring or *limiting* citizens of that race from participation in jury service are odious to our thought and our

Constitution. This has long been accepted as the law. Brunson v. North Carolina, 333 U.S. 851 [68 S.Ct. 634, 92 L.Ed. 1132]; Cassell v. Texas, 339 U.S. 282, 286–287, [70 S.Ct. 629, 631, 94 L.Ed. 839, 846, 847]; State v. Peoples, 131 N.C. 784, 42 S.E. 814. * * * The discrimination forbidden is racial discrimination, however, directed, to accomplish the result of *eliminating* or *limiting* the service of the proscribed race by statute or by practice."

(Emphasis added.)

In Eubanks v. State of Louisiana, supra, *Cassell* was said to be one of "an unbroken line of cases * * * [in which] this Court has held that a criminal defendant is denied the equal protection of the laws * * * if he is indicted by a grand jury * * * from which members of his race have been *excluded* because of their race." 356 U.S. at 585 & n. 1, 78 S.Ct. at 972 and n. 1, 2 L.Ed.2d at 993 & n. 1. (Emphasis added.) And a unanimous Court in Hernandez v. State of Texas, supra, characterized *Cassell* as applying the same "rule of exclusion" as was applied in *Hill.* 347 U.S. at 480 & n. 11, 74 S.Ct. at 671 & n. 11, 98 L.Ed. at 871 & n. 11 (n. 11 refers to n. 8 where *Cassell* is cited). Accord, Swain v. State of Alabama, supra, 380 U.S. at 204 & n. 1, 85 S.Ct. at 827 & n. 1, 13 L.Ed.2d at 763 & n. 1. Thus, the Court has consistently treated *Cassell* as proscribing exclusion either by means of proportional or other predetermined limitation or by a failure of the selectors to acquaint themselves with qualified Negroes.

### VIII.

With *Collins* unsupported by its assumed reading of *Cassell* and the in-

---

39. Mr. Justice Clark did quote with approval Mr. Justice Reed's statement that there must be "neither inclusion nor exclusion because of race." In the context of his opinion, and of the sentence in which he quotes this language, it is clear, however, he was referring to proportional limitation:

"But they [grand jury commissioners] are also told quite properly that a token representation of a race on a grand jury is not a constitutional requisite; that in fact it may reach the point of illegality; that representation on the grand jury by race in proportion to population is not permissible for there must be 'neither inclusion nor exclusion because of race.'"
339 U.S. at 297–298, 70 S.Ct. at 636, 94 L.Ed at 853.

dividual statements of the several Justices, we return to the beginning: the law not only permits, it mandatorily imposes its dual requirement—(1) fair representation and (2) the duty to know significant, identifiable elements of the community which have been the object of state discrimination.[40]

How then is this constitutional imperative to be achieved in a society that still bears the ugly scars of decades of racial segregation with all of its discriminations? For it is in this social structure that the problem arises. And it is in this social structure—not that of the hoped for idyllic state when the last vestige of

**40.** We have this comment as to Judge Bell's special concurrence. In it Judge Bell views our recognition of this dual requirement as resulting in the fragmentation of the cross-section standard and the establishment of a "remarkable new doctrine." He agrees that the jury selectors "must do their duty," but fearful that they will "be tried" and that counsel and courts will "test the knowledge and activities of the jury commissioners," he insists that the Constitution solely "looks to the result."

We disagree. True enough, the result is important in determining the existence of a prima facie case. But this is only the starting point, not the end. For conceivably, though there are no cases where it has been done, a prima facie case ostensibly established by the result could be rebutted by the State's showing that the system was calculated to produce a fair cross-section and that the lack of a cross-section on a particular list or panel just happened to be the fortuitous result of chance. Conversely, a system may be constitutionally infirm even though the result in a particular case is a fair cross-section and thus even though there is no prima facie case. This is precisely what the Supreme Court indicated in *Akins, Cassell,* and *Swain.* These cases did not, contrary to Judge Bell's assertion, simply turn on the "result." In *Akins* there was no prima facie case (see note 31, supra), for the panel itself, with one Negro included, closely approached a cross-section. And yet the Court went on to examine the intentions and actions of the commissioners (see notes 33 & 34, supra) and affirmed only on the ground that purposeful limitation had not been factually demonstrated. This was all unnecessary labor if constitutionality turns solely on the result. Likewise, in *Cassell* there was no prima facie case and the panels themselves closely reflected a fair racial cross-section. (See pp. 35–36, supra) But the Court reversed because the commissioners had failed in their duty to know qualified Negroes. Disclaiming any necessity to test the selection process solely by the result it produced, the

Court said, "[I]t is enough to have direct evidence based on the statements of the jury commissioners in the very case * * * that they chose only whom they knew, and that they knew no eligible Negroes in an area where Negroes made up so large a proportion of the population * * *." 339 U.S. at 290, 70 S.Ct. at 633, 94 L.Ed. at 848–849. Also, in *Swain,* though there was no prima facie case and the Court eventually affirmed, it did so only after examining at length (see note 20, supra) the intentions and methods of the commissioners.

The simple fact then is that in all of these cases the jury selectors were inescapably on trial, their "knowledge and activities" being carefully "tested." The Court painstakingly scrutinized their intentions *(Akins)* and knowledge *(Cassell)* as discovered from their statements and actions. And this is precisely what we did in each of our recent en banc decisions in *Davis, Scott* and Rabinowitz v. United States, 5 Cir., 1966, 366 F.2d 34 [No. 21256]. Each of these were prima facie cases in which the systems used failed to produce the required cross-sections on the particular panels, lists, and boxes challenged. If, according to Judge Bell, these results were enough to require reversals, then much judicial effort was wasted in each case in our extensive examination of the selectors' methods, knowledge, and intentions. That this could not be the case is dramatically illustrated by our en banc decision in Billingsley v. Clayton, supra. Although the bare statistics there came close to presenting a prima facie case, we affirmed after examining the methods and intentions of the jury selectors and finding neither to be discriminatory.

Thus, we must recognize that to a certain extent the commissioners will be on trial, as they have been for the past 100 years, to determine whether the system they use is designed to secure a fair cross-section of the community and whether in the application of such system they considered significant racial elements of the community.

this invidious distinction has gone away —that the constitutional ideal must be made to work. The answer is clear.

To fairly represent the community, there must be an awareness of the make-up of that community. Even random selection from broad lists, such as voter registration records, city directories, tax rolls, public utility customer lists, and the like, inescapably requires a basic preliminary test: do each, or all, or some, give a true picture of the community and its components? Of course that condition precedent may be satisfied only by testing this "sample" against the known components—racial, economic, sociological, educational, etc. It is inevitable, therefore, that jury selectors be *conscious* of those components. And where identifiable racial groups are significant elements, that means there must be an awareness of race as such.

But even more subjective is the demand that jury selectors make themselves acquainted with, not just the class, but the members of it in order to determine the identity and availability of individuals who have the qualifications for potential jurors and whose presence is required in the "universe" to assure fair community representation. Here again noncontroversial distinctions illustrate the process. In a municipality where, as is frequent, geographical areas —precincts, wards, sections—reflect significant groups, such as laborers, highly educated professionals or executives, those of lower incomes, the wealthy, or the like, jury selectors must first "know" that community. But they must also "know" the internal structure of such area groupings sufficiently to be able to determine identity and availability of those qualified to serve.[41]

There are, of course, a variety of ways of going about this. One, obviously, is fairly to place on the juror-selecting body persons from or closely identifiable with such groups. The selectors thus serve the dual role as selectors and as the source of indispensable information. Another, broadly, is the establishment of a more or less systemized procedure for contacting responsible members or organizations within the class to obtain names or lists of names of those likely to be available and qualified. But whether one or the other, or some other variation, the process has a single end: to know the availability of persons in that class.

---

41. Of course, as we have so often emphasized (and now reiterate) in this and our other recent en banc decisions, see note 21, supra, and accompanying text, and note 40 supra, compliance with this duty to "know" significant elements of the community does not require that a particular list be a perfect mirror of the community. For as the Supreme Court so recently said in Swain v. State of Alabama, supra:

"Neither the jury roll nor the venire need be a *perfect* mirror of the community or *accurately* reflect the proportionate strength of *every* identifiable group."

380 U.S. at 208, 85 S.Ct. at 829, 13 L.Ed.2d at 766. (Emphasis added.) And the Court in *Swain* went on to note:

"Undoubtedly the selection of prospective jurors was somewhat haphazard *and little effort was made to ensure* that *all* groups in the community were *fully* represented. But an imperfect system is not equivalent to purposeful discrimination based on race."

380 U.S. at 209, 85 S.Ct. at 830, 13 L. Ed.2d at 766. (Emphasis added.) The Court then quoted, 380 U.S. at 209 n. 5, 85 S.Ct. at 830 n. 5, 13 L.Ed.2d at 766 n. 5, the following language from Thomas v. State of Texas, 1909, 212 U.S. 278, 283, 29 S.Ct. 393, 394, 53 L. Ed. 512, 514:

"It may be that the jury commissioners did not give the negro race a *full* pro rata with the white race in the selection of the grand and petit jurors in this case; still this would not be evidence of discrimination. *If they fairly and honestly endeavored to discharge their duty*, * * * then the Constitution of the United States has not been violated."

(Emphasis added.) Indeed, this is what our opinion requires: that the jury selectors fairly and honestly discharge their duty to become acquainted with significant racial elements of the community in order to assure that the system is likely to produce a list which represents a fair cross-section of the community.

The subject of scrutiny is that class. It is people within that class who are the object of the search. In the look and in the discovery, it is membership in that class which is the decisive thing.

When that class is a racial group and, moreover, a racial group which historically has been the object or victim of state-generated discrimination, the selectors can perform their constitutionally-imposed duty only by being *conscious* of that class. This means they must be conscious of that race. And they must be conscious that the system contrived or followed by them has as its conscious aim the supplying of persons of that race for inclusion in the "universe." In a setting where the presence of the Negro race in the community structure sets in motion the constitutional duty to know, a juror selector could fulfill that duty only by being aware of that race and the steps reasonably needed to assure representation of that race in the "universe" from which jurors are obtained. Not only may he do so, he must. Thus the conscientious Judge instructing the juror selector group would be on sound ground in formally charging the body in terms of the dual constitutional imperative discussed at length in Part V. Surely, the selectors would be within their rights in following such instructions. How then can it be said that conscientiously to do what the Constitution demands makes the result bad because race has been consciously considered to assure that race has not been the basis of discrimination?

That this perhaps poses difficulties in administration is not decisive. Few there are of the guaranties so vital to real freedom which do not daily pose troublesome problems—accommodating society's need for protection from the lawless with securing Fourth, Fifth and Sixth Amendment rights to the accused, or the First Amendment guaranty of free press, with the Fifth, Sixth and Fourteenth Amendment right of a fair trial, or the like. As in these difficult areas of constitutional rights, this one, too, is complex. The dual requirements making awareness of race inevitable must be met, but this must never, simply never, be done as the means of discrimination. It must never, simply never, be applied to secure proportional representation. It must never, simply never, be applied to secure a predetermined or fixed limitation.

Although there is an apparent appeal to the ostensibly logical symmetry of a declaration forbidding race consideration in both exclusion and inclusion, it is both theoretically and actually unrealistic. Adhering to a formula which in words forbids conscious awareness of race in inclusion postpones, not advances, the day when this terrible blight of racial discrimination is exterminated. The challenge is to assure constitutional equality now. This often means, as it did in this case, eradication of the evils of the past. That evil of racial exclusion cannot be ignored. It must be reckoned with in terms which permit, indeed assure, equality for the immediate future. The evil and the evil practices are not theoretical. They are realities. The law's response must therefore be realistic.

Thus the solution to this problem, as in many other aspects of civil rights, comes from experience born of the rich history of the struggles of the past decade. This Court has not hesitated to fashion judicial remedies to the realities to assure actual enjoyment of the constitutional ideals. In voter registration cases, for example, history taught us much. History taught us that it is not enough to forbid discrimination in the future. Sanctioning, indeed requiring, the use of freeze orders to wipe out the effects of past discrimination, we described this process of living law:

"Like decisions in other fields, this was but new material out of which, with much coming later, and in the best Anglo-American juridical tradition, we synthesize principles and sanctions which experience demonstrates are needed. This experience has been rich, abundant in volume, and instructive. From it we have

learned that it is unrealistic to suppose that the evils of decades of flagrant racial discrimination can be overcome by purging registration rolls of white voters. From it we have also learned that unless there is some appropriate way to equalize the present with the past, the injunctive prohibitions even in the most stringent, emphatic, mandatory terms forbidding discrimination in the future, continues for many years a structure committing effective political power to the already registered whites while excluding Negroes from this vital activity of citizenship. * * * This experience has taught us also that if the constitutional ideal of voter rights free of racial distinctions—now over a century old—is to be effectively achieved, the relief required becomes successively more exacting as successive cases come to us."

United States v. Ward (Louisiana), 5 Cir., 1965, 349 F.2d 795, 802.

 Similarly, history—a long ten years of history—taught us that in school segregation cases time made increasingly more stringent sanctions essential. See, e. g., Price v. Denison Independent School Dist. Bd. of Education, 5 Cir., 1965, 348 F.2d 1010; Singleton v. Jackson Municipal Separate School Dist., 5 Cir., 1965, 348 F.2d 729. And the conscious awareness of race in extinguishing racial discrimination in jury service, no more than in eradicating racial exclusion in school attendance, does not itself become the instrument of racial discrimination. Judge Sobeloff, speaking for the Fourth Circuit, has but recently exposed this fallacy:

"If a school board is constitutionally forbidden to institute a system of racial segregation by the use of artificial boundary lines, it is likewise forbidden to perpetuate a system that has been so instituted. It would be stultifying to hold that a board may not move to undo arrangements artificially contrived to effect or maintain segregation, on the ground that this interference with the status quo would involve 'consideration of race.' When

school authorities, recognizing the historic fact that existing conditions are based on a design to segregate the races, act to undo these illegal conditions—especially conditions that have been judicially condemned—their effort is not to be frustrated on the ground that race is not a permissible consideration. This is not the 'consideration of race' which the Constitution discountenances."

Wanner v. Arlington County School Bd., 4 Cir., 1966, 357 F.2d 452, [Feb. 7, 1966].

 This is the law's response to the problem of today. Today we are dealing with the remnants of a segregated society being compelled to alter its ways to stamp out for all time this invidious distinction. As success is achieved and the constitutional ideal of a prejudiceless society is attained, the law will surely have both the capacity for and the duty of molding its relief to that hoped for situation. That our Constitution is vital enough to take cognizance of such changes, the evolution of prejudices, the appearance and disappearance of distinct and significant classes, and that it extends its protective arm as the need arises, is clear from the Supreme Court's exposition in Hernandez v. State of Texas, supra:

"Throughout our history differences in race and color have defined easily identifiable groups which have at times required the aid of the courts in securing equal treatment under the laws. But community prejudices are not static, and from time to time other differences from the community norm may define other groups which need the same protection. Whether such a group exists within a community is a question of fact. When the existence of a distinct class is demonstrated, and it is further shown that the laws, as written or as applied, single out that class for different treatment not based on some reasonable classification, the guarantees of the Constitution have been violated. The Fourteenth Amendment is not directed solely against discrimination

due to a 'two-class theory'—that is, based upon differences between 'white' and Negro."

347 U.S. at 478, 74 S.Ct. at 670, 98 L.Ed. at 870.

Affirmed.[42]

WISDOM, Circuit Judge (concurring in the result):

I regret that I cannot go all the way with the majority of the Court.

Since a state may abolish grand juries without violating the Fourteenth Amendment,[1] a state has considerable latitude in the type of grand jury system it may establish. Texas uses a small handpicked grand jury venire of sixteen. The system dictates the result the Court reached here; given the system, I concur in the result.

I applaud Judge Brown's eloquent apologia—but not when he discusses Collins v. Walker. I see no reason whatever for the Court to reach out and bootlessly overrule *Collins*.

I cannot accept the Court's premise that "the heart of the matter, the question facing us is whether we should adhere to Collins v. Walker." The result in *Collins* is right, dead right. Assuming the constitutionality generally of the Texas jury system, the result in *Brooks* is right, dead right. On principle, as I see it, *Collins* is not in conflict with *Brooks*. The facts in *Collins* compelled a different result from that reached in *Brooks*.

### I. On principle, *Collins* is not inconsistent with *Brooks*.

The Texas grand jury system is based on handpicking sixteen veniremen. Obviously, in such a limited selection proc-

ess the jury commissioners cannot meet the constitutional requirement that the jury represent a cross-section of the community without consciously selecting persons because of their race, color, economic standing, sex, and religion. To sustain the constitutionality of such a system, the Court must treat the Constitution as color-conscious.

The Louisiana jury system has three stages, three jury lists (except in Orleans Parish): (1) a "general venire" of 300 (the "jury box" or "jury wheel") selected by the jury commissioners from the parish at large and intended to represent a cross-section of the parish; (2) a grand jury venire of 20 selected (under the law in effect when Collins was indicted) by the commissioners from the general venire;[2] and (3) the jury panel of twelve, the foreman selected by the district judge and the other eleven drawn at random. In Orleans Parish, as a matter of custom, there was and is a preliminary stage, a fourth list, a card index or pool of 40,000 names from which the jury commissioners select a general venire or jury box of 750.

Texas has only two stages: (1) the commissioners handpick 16 for the venire; (2) the jury is drawn from the list of 16. The Louisiana general venires of 300 and 750, not the grand jury venire of 20, should be equated with the Texas list of 16.

Louisiana jury commissioners consciously include Negroes in the general venires of 300 and 750, just as the Texas commissioners did in their list of 16 from which the *Brooks* grand jury was chosen. As a matter of fact, the record in *Collins* shows that in Jefferson Davis Parish, where Collins was indicted and tried, the commissioners regularly and deliberately included a number of Ne-

---

42. Our holding that purposeful inclusion of Negroes is permissible brings to naught Petitioner's attack on the constitutionality of the Texas system. We adhere to the Supreme Court's repeated insistence that possible, but impermissible, uses of racial consideration do not invalidate the system. See note 4, supra.

1. Hurtado v. State of California, 1883, 110 U.S. 516, 4 S.Ct. 111, 28 L.Ed. 232.

2. Under the spur of *Collins*, the Louisiana statutes were amended to provide for random drawing of the individual grand jury venires. Acts 1964, No. 161, § 1; LSA–R.S. 15:180.

groes on the general venire of 300.[3] Their inadvertent failure to do so in selecting the general venire for the grand jury sitting when Collins was arrested led the commissioners to make a departure from the jury system that opens the door to abuse.

*Collins* approves the conscious inclusion of Negroes on the general venire. On principle, therefore, *Collins*, in terms, is consistent with the conscious selection of Negroes approved in *Brooks*. Thus, Judge Rives said in the last *Collins* opinion:

> "[*I*]*t may be that the 'general venire list' of three hundred persons is required to reflect a suitable cross-section of the population, and that the jury commissioners have an affirmative duty to include qualified Negroes in that list.* If such a requirement and duty have once been met in compiling the 'general venire list' no repetition is necessary or even allowed in the selection of the list of twenty 'therefrom.' Certainly, as to the list of twenty, the basis of selection cannot consciously take race or color into account. There may be a very real distinction in this respect between the 'general venire list' of three hundred and the 'list of grand jurors' consisting of the names of twenty citizens selected 'therefrom.'" (Emphasis added.) 335 F.2d at 420.

II. The facts in *Collins* are completely different from the facts in *Brooks* and compelled the holding the Court reached.

At the time Collins was arrested there were no Negroes on the grand jury then empanelled for six months in Jefferson Davis Parish. There were none on the grand jury venire, for each commissioner

assumed that the other commissioners would include Negroes and took no action himself. For this reason, instead of presenting Collins for indictment before the grand jury then sitting the parish officials *held him in jail for five months, then empanelled a new grand jury.* The new grand jury was drawn at random, as required by law, from a venire of 20 selected from the general venire of 300. The venire of 20 included six Negroes who were intentionally selected because they were Negroes; five served on the grand jury.

The significant fact in *Collins*, distinguishing it from *Brooks*, is that the commissioners used the jury system in a way that is inherently dangerous to the fairness of the system and prejudicial to the accused, giving him standing to challenge his indictment.[4] By holding Collins in jail for five months until a new grand jury could be selected, the parish, in effect, maintained an all-white grand jury for white accuseds and a mixed jury for Negro accuseds. By treating Collins differently from other defendants because of his race, the state violated the equal protection clause.

We may assume that the commissioners were actuated by benevolent motives. The effect, however, was not necessarily benign. The second grand jury was empanelled *after* the crime and arrest of Collins. It is fair to infer that the five who served on the special jury were under the pressure of believing that they had been chosen because of their color and for the purpose of indicting Collins. The departure from the system as it was established by law and practiced in the parish presented the opportunity for undetectable "fundamental unfairness", in the sense that term was used in Betts v. Brady, 1942, 316

---

3. The record shows that the trial judge had from time to time instructed the jury commissioners "to just be careful that there should be both white and colored members on the jury"; the clerk of the district court had instructed "that there should be some colored representation on each grand jury." 329 F.2d at 103.

4. See Comment, The Defendant's Challenge to a Racial Criterion in Jury Selection: A Study in Standing, Due Process and Equal Protection, 74 Yale L.Jour. 919 (1965); Note, 78 Harv.L.Rev. 1658 (1965); Note, 50 Iowa L.Rev. 619 (1965).

U.S. 455, 62 S.Ct. 1252, 86 L.Ed. 1595. The apparent tailoring of the jury selection to one particular case necessarily raises a suspicion of jury packing. It taints the integrity of the indictment and the reliability of the verdict. In distinguishing *Collins* on the facts, Judge Connally characterized the procedure as "salting" the jury for "a particular case":

> "I am convinced that the Court [in *Collins*] was further of the view that this new grand jury was literally 'loaded' with negroes purely as a defensive measure against a later charge of racial discrimination; *and that this grand jury was chosen in this fashion for the express purpose of considering an indictment against Collins alone.* I emphasize this circumstance because it is emphasized by the Court, being mentioned three times in the unanimous opinion of the Court on original submission (329 F.2d 100, at p. 104, col. 1, and p. 105, col. 1 and 2). * * Hence I construe *Collins* only as invalidating the selection of a grand jury chosen pursuant to a long standing practice purposefully to include negroes in a 'fair' proportion on every grand jury; and particularly so where a grand jury is picked, and *heavily salted with negroes, for the consideration of a particular case.*" 241 F.Supp. at 745–746.

When courts discuss fundamental rights, some of which might be described as absolutes, it is difficult to avoid lapses into overbroad pronouncements. If the language in *Collins* is overbroad, we should cut the language down to size. But it is unthinkable that we should give our blessing to the method of jury selection at issue in *Collins*.

III. *Brooks* should be limited to the facts it presents.

The Texas grand jury may not be a blue-ribbon jury, but it wears a broad and bright blue stripe. There is historical justification for the system. And if a state wants a superior grand jury, one that carries prestige, and is capable of bringing competent presentments on county jails, county hospitals, and other local agencies, much can be said for a small, handpicked, elite grand jury venire.[5] But it is no great shakes as an example of the "basic concepts of a democratic society and a representative government" extolled in Smith v. State of Texas.

As I read *Brooks*, the Texas system woud not be workable without quotas or proportional representation for minority groups. Even if the Texas system is not unconstitutional by contemporary equal protection and due process standards—there is grave doubt in my mind—it is anachronistic, a creaky sort of a vehicle to carry the great bundle of principles that constitute *Brooks*.

I do not follow the majority's view that the selection of two, and no more, Negroes, both chosen because of their race, cures the past evils of a discriminatory jury system. In these circumstances benign quota creates the appearance, not the reality, of non-discrimination. The effect here is to set a limit to the number of Negroes selected for the venire, thereby systematically excluding consideration of additional qualified Negroes. In such a system, the Jury Commission must concern itself less with the general fairness of the jury process than with the composition of each grand jury. This is exactly the opposite of the principle that it is the fairness of the method of selection that is important; a defendant is not entitled to have the members of his group or class represented on the particular jury that indicts or tries him. The only check is the good faith of the commissioners. The grand jury is virtually autonomous and the jury commissioners' selections depend on their subjective judgments. I do not question the good faith of Texas jury commissioners. I have no doubt

---

5. Vanderbilt, Judges and Jurors 62–66 (1958); Vanderbilt, Minimum Standards of Judicial Administration 185 (1949); Orfield, Criminal Procedure from Arrest to Appeal 146 (1947).

that in *Collins* the district judge and the jury were also in good faith. I suggest, however, that the Texas system and others like it are made to order for subtle but effective discrimination in the guise of token integration. *Brooks* licenses such systems.

In view of the nature of the Texas grand jury system, the invitation it offers for abuse, and the general invidiousness of racial classification, I would limit the question in *Brooks* as narrowly as possible. As I see it, *Brooks* held only that in a jury system based on a small, handpicked grand jury venire of 16 the commissioners did the only thing they could do to select a cross-section of the community: they knowingly selected two Negroes because of their race. Thus limited, it is not necessary to overrule *Collins:* in an analogous situation, the Jury Commission for Jefferson Davis Parish consciously selected Negroes for its general venire.

The Court itself carefully limited its holding in *Collins*.[6] *Collins* does not mean that all standards or classifications based on race or color are unconstitutional. Each case depends on the facts. The *Collins* rationale that there should be no racial exclusion or inclusion on the grand jury venire of 20[7] is not inconsistent

6. "We limited our holding in the present case as follows: 'The only list of importance to the decision of this case is the list of twenty from which the foreman was selected and the other eleven grand jurors drawn.' 329 F.2d 105. The question of whether it would be a denial of equal protection of the laws to intentionally include names of persons selected on the basis of individual qualifications and also on the basis of race in the 'general venire list' of three hundred is not here before us and is not decided." Collins v. Walker, 1964, 335 F.2d 417 at 420–421.

7. It was a close question in my mind whether to dissent or to concur in the result reached in *Brooks*. I concluded not to dissent because the petitioner did not directly attack the statutory scheme; and because on four occasions the United States Supreme Court has had the Texas jury system under consideration, although never on the precise issue *Brooks* raises. As I see it, given the Texas statutory scheme, the jury commissioners had no alternative. They could provide representative juries only by intentionally including Negroes.

I agree with Judge Rives' views in *Collins*, as he limited them (to the Louisiana grand jury system and to similar systems using a small grand jury venire of 16 or 20, selected not drawn by chance). Intentional exclusion or inclusion of Negroes on the grand jury venire violates the equal protection and due process clauses of the Fourteenth Amendment.

The decision to select Negroes on a venire of 20 requires the jury commissioners to determine how many Negroes should be included, how many whites. A decision as to what is a fair proportional representation or quota cannot be avoided. The intentional inclusion of six Negroes on a venire of 20 is only another way of saying that it is systematic exclusion of Negroes from fourteen-twentieths of the venire and the systematic exclusion of white persons from six-twentieths of the venire. Venire-stacking by any other name is jury-tampering.

As Judge Rives saw it in *Collins*, and I agree, the constitutional criterion is the individual's qualifications as a juryman; his race is irrelevant to his qualifications. *Cassell* put it, "A man is entitled to have charges against him considered by a jury in the selection of which there has been neither inclusion nor exclusion because of race". What is an impartial jury except one with its jurymen chosen as individuals regardless of race and other considerations that might affect the integrity of the fact-finding process? Again as *Cassell* put it, "Jurymen should be selected as individuals, on the basis of individual qualifications, and not as members of a race." 339 U.S. 286, 70 S.Ct. 631. This is an area of the law, above all other areas, where the Constitution *is* color blind, where Justice Harlan's words in Plessy against Ferguson do indeed apply:

"In respect of civil rights, common to all citizens, the Constitution of the United States does not, I think, permit any public authority to know the race of those entitled to be protected in the enjoyment of such rights. [163 U.S. at 554] There is no caste here. Our Constitution in color-blind, and neither knows nor tolerates classes among citizens. In respect of civil rights, all citizens are equal before the law. The humblest is the peer of the most powerful. The law regards man

with taking race into consideration in selecting the general venire of 300 or *perhaps* to correct imbalance in housing or employment.

In sum, I consider it a serious mistake for this Court to go beyond the necessities of the factual situation and overrule *Collins*—a case soundly decided on the present and potential in the jury manipulations of the Jefferson Davis commissioners. The unnecessary overruling of any case damages the judicial process. The unnecessary overruling of *Collins* damages mutual respect in federal-state relations and lowers jury standards. For example, in reliance on *Collins*, Louisiana changed its law to require that the grand jury venire of 20 be chosen indiscriminately at random from the large general venire. After having directed the State of Louisiana to march in that direction, this Court in *Brooks* now orders, "About face, to the rear, march". I do mean the rear.

GEWIN, Circuit Judge (concurring in the result):

Most of what is said in the scholarly, exhaustive, and extensive opinion of the majority is acceptable to me. I am in substantial agreement with what is said in Parts I, II, III, IV, VI and VII. I particularly applaud the judicial demise of Collins v. Walker, 329 F.2d 100 (5 Cir. 1964), on rehearing 335 F.2d 417 (5 Cir. 1965). I have difficulty with Parts V and VIII of the majority opinion.

While avowing to follow the teachings of Swain v. State of Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759, the latest pronouncement by the Supreme Court on the subject, Sections V and VIII then proceed to explain, dilute and erode the *Swain* principles. Constitutional concepts which were made clear by the "mirror" of *Swain*, have become clouded and now we "see through a glass darkly." The result is the creation of a veritable mystique in a field of constitutional law which had been clarified by *Swain* and other recent cases.

What is important to remember is the fact that most jury selection officials in both state and federal courts are laymen dedicated to the best performance possible of a rather difficult task. Jurors too are laymen so far as legal learning is concerned. It is good to have this mixture of laymen with the technical components of our court system. Constantly, laymen tend to draw us away from the technical thickets of the law to a more practical application of legal standards. The value of the jury system was recognized in the very beginning of American history, and constitutional provisions calculated to vouchsafe its preservation are prominent in our historical background as well as in the Constitution itself. The system has served us well. From the majority opinion I gain the very distinct impression that we are tinkering and meddling with it too much. What the majority says in Sections V and VIII creates an impenetrable and nebulous haze which obscures the constitutional duty of lay jury selectors rather than to furnish practical illumination for their guidance.

It is impractical to undertake to analyze all of the objectionable language in the mentioned sections; an example or two

---

as man, and takes no account of his surroundings or of his color when his civil rights as guaranteed by the supreme law of the land are involved. [163 U.S. at 559.]"

There are dicta, and there are dicta. Marbury v. Madison and *Dred Scott* have been explained away as dicta. One is still very much alive, its facts unknown to most persons; the other is dead, dead, its principal fact known to most persons. Even if *Cassell* might be explained away on the facts, it leaves a

vigorous, unassailable, and formidable set of principles apt and sound today.

This is not to say that there are no situations in which race must be taken into account. On the contrary, there may be many instances in which benevolent discrimination may be necessary as an appropriate remedy or in response to a social need. Congress, for example, has enacted numerous laws discriminating in favor of Indians. This Court fashioned the "freezing principle" to give special relief to Negros discriminated against in the past in applying to register to vote.

will suffice. Section V places too much emphasis on "startling statistics" and a duty to "search for." Under the statistical and searching formula, an easy attack can be directed upon any jury selection system. Without difficulty, jury selection officials can be convicted of failing to do enough searching. No doubt, cases will arise in which statistics will prove a total absence of certain identifiable groups. For example, as to a particular jury it may be easy to prove that there are not enough, or not any, Catholics, Protestants, Jews, laborers, the wealthy, business executives, professionals, or other components of a particular community.

Likewise, in Section VIII the selection of jurors from broad lists such as "voter registration records, city directories, tax rolls, public utility customer lists, and the like" is not approved unless such lists "give a true picture of the community and its components." The components are referred to and classified as "racial, economic, sociological, educational, etc." Even the inclusion of the listed "components" is not sufficient. The jury selectors "must also *'know'* the *internal structure* of such area groupings sufficiently to be able to determine identity and availability of those qualified to serve." (Emphasis added) The foregoing standards constitute the best efforts of the majority to give lay jury selectors practical guidelines to follow. Such standards invite an attack on the jury roll or venire in practically every case. Those who launch the attack will have a ready made background of confusion and uncertainty overshadowing the jury roll or the venire. Furthermore, in practically every case a good mixture of testimony can be presented relating to the wide fields of race, economics, sociology, and education; and when considered along with the positive injunction that the jury roll or venire must have been prepared by those who "know" the "internal structure of such area groupings," a holding that the jury selection process was not adequate will be impelled.

I regret to say that in my view our best effort to enlighten lay jury selection officials has only achieved the certain and inevitable result of creating confusion not only from their point of view; but in addition I suspect, there will be substantial confusion even amongst those who are charged with the duty of conducting the courts.

GRIFFIN B. BELL, Circuit Judge (concurring in result only):

I regret that I cannot join in all that is said in the majority opinion. I regret also having to respond to obiter dictum. It would perhaps be better to let the matter pass but for the fact that obiter frequently finds its way into briefs and even into opinions. In this instance the obiter is particularly mischievous. I have reference to the fragmentation of the settled constitutional doctrine that a jury list must reflect a fair cross-section of the community. Glasser v. United States, 1943, 315 U.S. 60, 85–86, 62 S. Ct. 457, 86 L.Ed. 680; Smith v. State [of] Texas, 1940, 311 U.S. 128, 130, 61 S. Ct. 164, 85 L.Ed. 84. The majority in three separate places in the opinion, pp. 14, 16, 23, has made the statement that the Constitution requires not only that the jury list represent a fair cross-section of the community but that the jury selectors must become acquainted with the human resources of the community. It is squarely put as " * * * the law not only permits, it mandatorily imposes its dual requirement—(1) fair representation . and (2) the duty to know significant, identifiable elements of the community which have been the object of state discrimination." p. 21, majority opinion.

This fragmentation of the fair cross-section standard into one part consisting of that, and a separate part consisting of what the jury commissioners know and how they have gone about their function results in a new constitutional principle. Henceforth, the jury commissioners will be tried. Their qualifications and conduct will be in issue. Did they perform their duty of knowing all signifi-

cant and identifiable elements of the community? If not, a new trial would be granted on constitutional grounds even though a fair cross-section of the community was represented on the jury list. There could hardly be a case where the jury drawn from a list which reflects a fair cross-section of the community. This new standard would result in a finding of constitutional infirmity in nearly all cases where there is not a perfect cross-section. Anything short of perfect might well demonstrate negligence or inattention on the part of the jury commissioners. Yet, we are told in Swain v. State of Alabama, 1964, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759, that the jury list need not be a perfect mirror of the community or accurately reflect the proportionate strength of every identifiable group.

I pose this problem simply to point up this remarkable new doctrine. I do not do so with any confidence that my effort will make any great impression on anyone at this time. However, I would like to be recorded as being aware of the fact that this newly discovered constitutional principle will be a fertile new ground for postponing the execution of sentences. The long delays that now inhere in the law [1] will today receive, gratis obiter dictum in the majority opinion, a wholly new weapon. In the future careful counsel will not only test the jury list to make certain that it reflects a fair cross-section of the community; they will test the knowledge and activities of the jury commissioners.

The Constitution is a practical instrument; the entire body of law should be. Courts should be alert not to make it impracticable, but this decision will insure impracticability. It will damage the law as a workable institution in that the rights of society will be further delayed if not altogether avoided. The constitutional right involved is to be tried before a jury drawn from a list which reflects a fair cross-section of a community. We are a long ways from vindicating that constitutional right. We would do well to concentrate on it rather than putting more stumbling blocks in its path.

Of course, the jury commissioners must do their duty but the test is in whether the lists represents a fair cross-section; not in what they know or in how they go about their function. Their dereliction will often times account for an unconstitutional result but the Constitution looks to the result. I do not read Avery v. State of Georgia, 1952, 345 U.S. 559, 73 S.Ct. 891, 97 L.Ed.2d 1244; Cassell v. State of Texas, 1950, 33C U.S. 282, 70 S.Ct. 629, 94 L.Ed. 843; Akins v. State of Texas, 1944, 325 U.S. 398, 65 S.Ct. 1276, 89 L.Ed. 1692; or Hill v. State of Texas, 1942, 316 U.S. 400, 62 S.Ct. 1159, 86 L.Ed. 1559, as holding to the contrary. Each turned on a discriminatory result.

I join in the conclusion reached by the majority. I also welcome the passing of Collins v. Walker, 5 Cir., 1964, 329 F.2d 100, because intentional inclusion on the general jury list based on race is a means of converting the constitutional mandate of a fair jury list into a reality. It will always be necessary to include persons based on race or other economic, social, religious, political and geographical groups of a community if the result of the selection system used happens to fall short of the constitutional requirement. It is unfortunate that we replace the unworkable doctrine of Collins v. Walker with a more unworkable one, albeit by obiter dictum.

---

1. As examples of unusual delay see the following cases heard en banc along with the instant case in which the sentence was imposed in 1959: United States of America, ex rel. Labat and Poret v. Bennett, 5 Cir., 365 F.2d 698, No. 22,218, appellants convicted by a jury in 1953 of rape and sentenced to death; Scott v. Walker, 5 Cir., 358 F.2d 561, No. 20,814, appellant sentenced to death in 1958 for rape; United States of America ex rel. Edward Davis v. Davis, Governor, 361 F.2d 770 No. 21,976, sentence of death in 1959 for the murder of a police officer.